ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 0 4 2014

JAMES N. ~~~~ EN, Clerk
By: ~~~~
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **Plaintiff,** | ) |
| *ex rel.* | ) Case No. **1:14-CV-2846** |
| | ) |
| [UNDER SEAL], | ) |
| | ) |
| | ) **WSD** |
| **Plaintiff-Relator,** | ) |
| | ) |
| v. | ) |
| | ) |
| [UNDER SEAL], | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## FILED IN CAMERA AND UNDER SEAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 0 4 2014

JAMES N. HATTEN, Clerk
By: _____
        Deputy Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA, and the State of GEORGIA, *ex rel.* ROSA SILER,**<br><br>**PLAINTIFFS,**<br>v.<br><br>**PRIMROSE PHARMACY LLC; KARL BUCHOLZ, INC. d/b/a DIABETIC PHARMACY SOLUTIONS; KARL R. BLASS-SCHUTZ; KARL BUCHOLZ; and SCOTT NAVANI,**<br><br>**DEFENDANTS.** | **Filed Under Seal pursuant to 31 U.S.C. § 3730(b)(2); O.C.G.A. § 23-3-122(b)(2); and O.C.G.A. § 49-4-168.2(c)(1)**<br><br>**1:14-CV-2846**<br>**C.A. No. _____**<br><br><br>**(Jury Trial Requested)** |

## COMPLAINT

## I.  INTRODUCTION

1.     This is a *qui tam* action brought by the United States of America and the State of Georgia (collectively the "Government"), by and through Plaintiff-Relator Rosa Siler, against Primrose Pharmacy LLC ("Primrose"), Karl Bucholz, Inc. d/b/a Diabetic Pharmacy Solutions ("DPS"), Karl R. Blass-Schutz ("Karl Blass"), Karl Bucholz, and Scott Navani  to redress violations of the False Claims

Act ("FCA"), 31 U.S.C. §§ 3729-3733, the Georgia Taxpayer Protection False Claims Act ("Georgia TPFCA"), O.C.G.A. § 23-3-120 – § 23-3-127, and the Georgia False Medicaid Claims Act ("Georgia FMCA"), O.C.G.A. §§ 49-4-168 *et seq.*

      2.     Defendants, a mail-order pharmacy and its owners and/or managers, obtained confidential information about diabetic patients and, using that information, caused doctors to generate prescriptions for diabetic supplies which were paid for by government payors. Defendants' conduct, which also included the routine waiver of patient co-pays, violated the Anti-Kickback Statute, HIPAA, and the direct marketing prohibitions in the Social Security Act, and resulted in Defendants submitting, or causing to be submitted, claims that violated the False Claims Act.

      3.     Defendants' scheme, which caused or resulted in the filing of thousands of false claims since January 2013, can be broken down into a three step process:

- Defendants Karl Blass and Karl Bucholz appropriate through acquisition (or otherwise) diabetic patient leads, including confidential information, from Defendant Scott Navani and others. The scope of this information includes social security numbers, birth dates, addresses, phone numbers, insurers, and

2

doctors' names, addresses, and phone, and fax numbers of thousands of diabetic patients.

- After acquiring confidential patient information including the name and contact information of treating physicians, Defendant DPS faxes the treating physician listed in the "leads" a largely completed prescription form on Primrose Pharmacy letterhead. Although this form states that the patient authorized contact with the doctor, in many cases, the patient had not authorized Primrose or DPS to do so. Once the treating physician completes and signs the form and returns it to DPS, the prescription and confidential patient information are uploaded by DPS into a database shared with Primrose.

- Defendant Primrose then contacts the patient's insurer – including Government payors– to ensure that Primrose will receive sufficient reimbursement to secure a profit even after the co-pay has been waived. With the signed prescription and knowledge of profitability in hand, Defendant Primrose then contacts the patient to verify their address and to induce their cooperation, telling them (1) their doctor had approved Primrose to provide their diabetic supplies (omitting that Defendants had told the doctor the

3

patient authorized the prescription) to verify their address and (2) Primrose is

waiving any applicable co-pay fees.

The following graphic illustrates the scheme:



## II. PARTIES

### A. Plaintiffs

4.      Plaintiff-Relator Rosa Siler was a pharmacy technician and the

designated Medicare Compliance Officer for Primrose Pharmacy LLC in Sandy

Springs, Georgia from September 13, 2013 until December 13, 2013. In her

capacity as the designated Medicare Compliance Officer, Relator Siler handled

billing issues for the entire pharmacy, composed a Code of Conduct to meet Medicare guidelines, and verified that insurance contracts were Medicare compliant. As a pharmacy technician, Relator Siler filled and billed prescriptions.

5.      Relator Siler has worked as a Certified Pharmacy Technician since 2008. Ms. Siler obtained her pharmacy technician license for Georgia, number PHT020730, from the Georgia Board of Pharmacy on September 16, 2013.

### B. Defendants

#### *Individual Defendants*

6.      Defendant Karl Bucholz currently is the President, Secretary, Director, and owner of Diabetic Pharmacy Solutions and President of GeoTarget Media. Karl Bucholz's address is 22214 Bella Lago Drive, Boca Raton, FL 33433. Karl Bucholz is intimately involved in the operation of Primrose. Although he lives in Florida, Karl Blass regularly attends Primrose meetings by video conference and occasionally sends some of his employees from Diabetic Pharmacy Solutions to Georgia to check on Primrose and its operations.

7.      Defendant Karl Blass is the President of Primrose and maintains a daily presence at the Primrose facility in Sandy Springs, Georgia. According to the Georgia Secretary of State's corporations database, Karl Blass is also the CEO, CFO, and Secretary of Blass-Schutz Capital, Inc., which maintains the same

5

principal place of business as Primrose. Karl Blass's address is 6768 Brandon Mill Road, Atlanta, Georgia 30328.

8. Defendant Scott G. Navani is the owner of Wealth International Group LLC, a Florida corporation with a principal place of business in Delray Beach, Florida. According to the Florida Secretary of State's SunBiz database, Scott Navani also is the registered agent for Boss



Ads, Inc. and Malware Knights, Inc., located at the same address as Wealth International Group LLC. Scott Navani's address is 9879 Robins Nest Road, Boca Raton, Florida 33496. Above is a true and correct photo of Defendant Scott Navani taken by law enforcement officials in Florida.

### *Corporate Defendants*

9. Defendant Primrose Pharmacy LLC ("Primrose") is a Georgia limited liability company, with its principal place of business at 8601 Dunwoody Place, Suite 146, Sandy Springs, Georgia 30350. Primrose is an independent specialty mail order pharmacy providing, almost exclusively, diabetic supplies and medications. Primrose is licensed by the Georgia Board of Pharmacy, license number PHRE009687. The licensed pharmacist for Primrose from September 21, 2013 until at least December 16, 2013, was Glenn Douglass Kaas, Georgia license

6

number RPH014203. The current supervising pharmacist for Primrose is Jerrund

Thomas Wilkerson, license number RPH019148.

10.    Defendant Karl Bucholz, Inc., d/b/a Diabetic Pharmacy Solutions,

("DPS") is a Florida corporation with a principal address of 4733 West Atlantic

Avenue, Suite C5, Delray Beach, Florida 33445 and a mailing address of 7050

West Palmetto Park Road, Suite 167, Boca Raton, Florida 33433.[1] The fictitious-

name filing for Diabetic Pharmacy Solutions was filed with the Florida Secretary

of State on January 17, 2013. DPS maintains a website at

diabeticpharmacysolutions.com, where it states that the services it provides to

pharmacies includes "doctor chasing services" and "lead generation."

## III.    JURISDICTION AND VENUE

11.    Relator brings this action on behalf of herself and on behalf of the

United States and the State of Georgia for violations of the False Claims Act, 31

U.S.C. §§ 3729 – 3733, the Georgia Taxpayer Protection False Claims Act

("Georgia TPFCA"), O.C.G.A. § 23-3-120 – § 23-3-127, and the Georgia False

Medicaid Claims Act ("Georgia FMCA"), O.C.G.A. §§ 49-4-168 *et seq*.

---

[1] Karl Bucholz, Inc. also operates under the fictitious name of GeoTarget Media, according to a fictitious name filing filed on January 22, 2009 with the Florida Secretary of State. GeoTarget Media maintains a separate mailing address and principal place of business from DPS. GeoTarget Media is involved in, *inter alia*, "affiliate marketing" designed to generate leads and maximize referrals.

7

12.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and  1345 and 31 U.S.C. § 3732(a).  This Court has supplemental jurisdiction over this action pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because at least two of the Defendants can be found in and all of the Defendants transact business in this District.  In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District.

14.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

15.     There has been no public disclosure of the allegations herein in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

16.     To the extent that there has been a public disclosure unknown to the Relator, she is the "original source" under 31 U.S.C. § 37370(e)(4), O.C.G.A. § 23-3-122(j)(3)(C), and O.C.G.A. § 49-4-168.2(l)(1).  During Relator's employment

8

with Primrose, she gained direct and independent knowledge of the information upon which the allegations in this Complaint are based.

17.     Relator has voluntarily provided information to the Government before filing a *qui tam* action based on her information, and has submitted to the United States Attorney for the Northern District of Georgia and the Attorney General for Georgia a statement summarizing known material evidence and information relating to this Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2), O.C.G.A. § 23-2-122(b)(2), and O.C.G.A. § 49-4-168.2(c)(1).

## IV.     STATORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. Government Health Programs

18.     The federal and state governments through their Medicaid and Medicare programs, are the primary, but not exclusive, payor for the patients serviced by Primrose.

19.     Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

20.     There are four parts to Medicare: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare

9

Advantage, which was formerly known as Medicare + Choice); and Medicare Part D (prescription drug coverage that was enacted as part of the Medicare Modernization Act of 2003 ("MMA") and went into effect on January 1, 2006).

21. Medicare Part C encompasses the scope of Part A and Part B combined, but provides coverage through private insurance companies. Medicare beneficiaries have the option to receive their Medicare benefits though private health insurance plans, instead of through the original Medicare plan (Parts A and B). Originally, these programs were known as "Medicare + Choice" or "Part C" plans. Following the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 – which created Part D – "Medicare + Choice" plans were changed by adding prescription drug coverage and became known as "Medicare Advantage" ("MA") plans. Currently, more than 30% of all Medicare beneficiaries are in a MA plan. Most MA plans also offer Part D outpatient drug coverage and are sometimes also called Medicare Advantage Prescription Drug plans. Because Part B covers all durable medical equipment ("DME"), prosthetics, orthotics, and supplies, including diabetes test strips and blood glucose monitors for individuals with diabetes, pursuant to 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(6), and 1395x(n), Medicare Advantage Plans also cover diabetic testing

10

supplies.[2]   Primrose submitted and continues to submit claims to Medicaid

Advantage plans as well as to the Georgia Medicaid program.

22.     The United States pays private insurance companies that supply MA

plans a monthly reimbursement rate based on a formula established by the Center

for Medicare and Medicaid Services, pursuant to authority form the Secretary of

Health and Human Services. *See* 42 U.S.C. § 1395w-23; 42 C.F.R. § 422.304.

This monthly fee, called a capitation rate, is based on the health risk factors of the

plans' enrollees, including their ages, disability statuses, genders, institutional

statuses, and health statuses and is paid to the private insurance companies to

administer and manage their enrollees' healthcare insurance.

23.     Medicare pays "charged-based" providers or suppliers on the basis of

the "reasonable charge" for the item or service provided. *See* 42 U.S.C. §

1395u(b)(3). Diabetic testing supplies provided to Medicare beneficiaries are paid

under this payment system. A "reasonable charge" is determined by considering

criteria contained in regulations, including the examination of (1) the actual charge,

---

[2] Primrose does not supply diabetic testing supplies to patients covered by
Medicare Part B as it is not a Medicare national mail-order contract supplier in
Medicare's National Mail-Order Program for diabetic testing supplies.  Because
pharmacies do not need to be a Medicare national mail-order contract supplier in
Medicare's National Mail-Order Program to provide supplies to Medicare
Advantage plans, Primrose is able to supply patients enrolled in Medicare
Advantage plans.

(2) the customary charge, and (3) the prevailing charge in the location for similar items or services. *See* 42 U.S.C. § 1395x(v). The "reasonable charge" cannot exceed the actual charge for the item or service. 42 C.F.R. § 405.502. Medicare covers 80 percent of the "reasonable charge." 42 U.S.C. § 13951(a)(1).

24.     The waiver of copayments constitutes a kickback prescribed by, *inter alia*, the Anti-Kickback Statute. The waiver of a copayment also causes the actual charge of the item to be misstated to government payors. By routinely waiving the copayment, the actual charge of an item to the beneficiary is the amount less the waived copayment – and Medicare should only pay for 80 percent of this corrected actual charge. For example, if the charge for a set of lancets is $100, but the copayment of $20 is routinely waived, then the actual charge is $80. Medicare should only be paying 80 percent of the $80, or $64, instead of 80 percent of $100 (or $80). In this example, Medicare is paying $16 more than it should for the item.

25.     Congress created Medicaid in 1965, at the same time it created Medicare. Medicaid is a public assistance program providing payment of medical expenses to low-income patients. Funding for Medicaid is shared between the federal and state governments. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's

12

coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

### B. The Federal False Claims Act and State False Claims Acts

26.     The Federal False Claims Act provides that any person who: (1) knowingly presents or causes to present a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; and/or (3) conspires to commit a violation of either (1) or (2)  is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (C).

27.     The Georgia Taxpayer Protection False Claims Act similarly provides that any person, firm, corporation, or other legal entity that: (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; and/or (3) conspires to commit a violation of either (1) or (2) is liable to the State of Georgia for a civil penalty up to $11,000 for each false or fraudulent claim, plus three times the amount of damages sustained by the state or local government.  O.C.G.A. §§ 23-3-121(a).

13

28.     The Georgia False Medicaid Claims Act also provides that any person who: (1) knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; and/or (3) conspires to commit a violation of either (1) or (2) is liable to the State of Georgia for a civil penalty of up to $11,000 for each false or fraudulent claim, plus three times the amount of damages sustained by the Georgia Medicaid program.

## C. The Medicare Anti-Kickback Statute and Waiving of Co-Payments

29.     Routine waiver of deductibles or copayments by providers or suppliers is unlawful under the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  This statute provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit, or receive remuneration to induce a person to purchase or order any good, service, or item that is reimbursable under a federal health benefits program.  Section 1320a-7a(i)(6) defines remuneration to include the waiver of coinsurance and deductible amounts.  A violation of the Medicare Anti-Kickback statute is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

14

30.     The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). Similarly, the general rule that a waiver of coinsurance or a deductible is a form of remuneration is subject to limited exceptions. *See* § 42 U.S.C. § 1320a-7a(i)(6)(A)-(I). None of the statutory exceptions or regulatory safe harbors protects the Defendants' conduct in this case.

31.     The Balanced Budget Act added administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

32.     More recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(f)(1), amended the Medicare Anti-Kickback Statute to clarify that violations of its "anti-kickback" provisions can be enforced under the False Claims Act. The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act,

15

may occur even if an individual does not have "actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(f)(2).

33.     As detailed below, Primrose's routine waiver of copayments for Medicare beneficiaries violates provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act.  Primrose's waiver of copayments acts as an inducement to Medicare beneficiaries to order their diabetic test strips, monitors, and other diabetic testing supplies from Primrose.   HHS OIG has stated that routine waiver of Medicare co-payments is, other than with a few narrow exceptions like clinical trials, a kickback under the Anti-kickback Statute and would result in false claims. *See, e.g.*, Dept. of Health and Human Services, Publication of OIG Special Fraud Alerts, Federal Register, Dec. 19, 1994 (stating that routine waiver of deductibles and copayments "is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare"), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

   **D. Regulation of Suppliers**

34.     Section 1834(a)(17) of the Social Security Act, 42 U.S.C. § 1395m, prohibits suppliers of DME from making unsolicited calls to Medicare beneficiaries regarding the furnishing of a covered item, except in three specific

situations: (1) the beneficiary has given written permission to the supplier to make contact by telephone; (2) the contact is regarding a covered item the supplier has already furnished to the beneficiary; or (3) the supplier has furnished at least one covered item to the beneficiary during the preceding fifteen months.

35.    A physician's preliminary written or verbal order prescribing DME for a beneficiary is not a substitute for the requisite written consent of a Medicare beneficiary to avoid liability under 42 U.S.C. § 1395m(a)(17)(A).

36.    Section 1395m(a)(17)(B) specifically prohibits payment to a supplier who knowingly submits a claim generated pursuant to a prohibited telephone solicitation. Accordingly, such claims for payment are false and violators are potentially subject to criminal, civil, and administrative penalties, including exclusion from the federal health care programs.

37.    DME suppliers cannot do indirectly what they are prohibited from doing directly by using independent marketing firms to make unsolicited telephone calls to Medicare beneficiaries to market DME. Except in the three specific circumstances described in the statute, § 1395m(a)(17) prohibits unsolicited telemarketing by DME suppliers to Medicare beneficiaries without regard to whether contact with the beneficiaries is made by the suppliers directly or by another party on the DME suppliers' behalf. Moreover, a DME supplier is

17

responsible for verifying that marketing activities performed by third parties with whom the supplier contracts or otherwise does business with do not involve prohibited activity and that information purchased from third parties was neither obtained nor derived from prohibited activity. If a claim for payment is submitted for items or services generated by a prohibited solicitation, both the DME supplier and the lead generator/telemarketer are potentially liable for criminal, civil, and administrative penalties for causing the filing of a false claim.

### E. HIPAA

38.     The Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) prohibits the use or disclosure of protected health information by a covered entity except when pursuant to and in compliance with authorization, among other exceptions. 45 C.F.R. § 164.502. Moreover, a covered entity must obtain authorization for any use or disclosure of protected health information for marketing purposes. 45 C.F.R. § 164.508.

39.     Providers of blood-testing strips and blood glucose monitors are covered entities for the purposes of HIPAA. *See* 45 C.F.R. § 160.103 (defining covered entities to include health care providers who transmit health information in electronic form); 42 U.S.C. § 1320d(3) (defining health care providers to include providers of medical or other health services); 42 U.S.C. § 1395x(s)(6) (defining

18

medical or other health services to include durable medical equipment); and 42 U.S.C. § 1395x(n) (defining durable medical equipment to include blood-testing strips and blood glucose monitors for individuals with diabetes without regard to whether the individual has Type I or Type II diabetes or to the individual's use of insulin).

    40.    Protected health information includes information that is created or received by a health care provider that relates to (a) the past, present, or future physical health or condition of an individual, (b) the provision of health care to an individual, or (c) the past, present, or future payment for the provision of health care to an individual, and includes demographic information collected from an individual, such as name, social security number, address, telephone number, and account number, that is transmitted by or maintained in electronic media or in any other form or medium. *See* 45 C.F.R. § 160.103 (defining protected health information) and 42 U.S.C. §1320d(6) (defining individually identifiable health information).

    41.    Authorizations are only valid if they describe the information to be used or disclosed and the purpose of the requested use or disclosure and include the name or other specific information of the person to whom the covered entity may make the disclosure, the name of the person authorized to make the requested

19

use or disclosure, an expiration date that relates to the individual or the purpose of the use or disclosure, and the signature of the individual and date, among other listed requirements. 45 C.F.R. § 164.508.

42.     Marketing includes communications about a product or service that encourages recipients of the communication to purchase or use the product or service. 45 C.F.R. § 164.501.

43.     If an individual or a covered entity violates the Privacy Rule, that person or entity can be subject to a penalty and damages under 42 U.S.C. § 1320d-5 or fines and/or imprisonment under 42 U.S.C. § 1320d-6. The penalties for violations due to reasonable cause, as defined in 45 C.F.R. § 160.401, and willful neglect, as defined in 45 C.F.R. § 160.401, range from $1,000 for each violation, not exceeding $100,000 in total, to $50,000 for each violation, not exceeding $1,500,000 in total. 42 U.S.C. § 1320d-5(1), (3). Individuals can be fined between $50,000 and $250,000 and imprisoned for up to 10 years. 42 U.S.C. § 1320d-6(b).

# V. SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS

## A. Diabetes and Management of the Disease

44.     Diabetes causes the human body to either stop producing insulin (Type 1) or to improperly use the insulin it does produce (Type 2). More than 18

20

million Americans have been diagnosed with diabetes, and more than 26% of Americans aged 65 and older had diabetes as of 2010.[3]

45.     All of Type 1 diabetics and an increasing number of Type 2 diabetics test their blood sugar levels multiple times a day.  Medicare Part B and Medicare Advantage plans cover diabetic testing supplies ("DTS"), including home blood-glucose monitors, blood-glucose test strips, often called diabetes test strips, and lancet supplies prescribed by physicians and used to test blood sugar.

46.     Patients use a disposable sterile lancet placed in a lancet device to draw a drop of blood, place that drop of blood on a test strip, and insert the test strip into the blood-glucose monitor to obtain a reading of their blood sugar level. Patients may also obtain control solution to calibrate their blood-glucose monitor regularly.

**B. The Leads**

47.     Relator, through her work at Primrose, learned that Karl Blass purchases leads for Primrose from Scott Navani for approximately $100,000.  She also discovered that Karl Bucholz also purchases leads for Primrose.  These leads are uploaded directly into the "Zoho software" that is maintained and accessible by both Primrose and DPS.

[3] CDC National Diabetes Fact Sheet, 2011.
http://www.cdc.gov/diabetes/pubs/pdf/ndfs_2011.pdf

21

48.     Each lead includes: information about the patient, the patient's doctor, and the patient's insurance. The patient information includes the patient's name, address, and telephone number. The doctor information includes the doctor's name, Medicare ID number, and contact information (including fax number). The insurance information either includes information about the patient's insurer and/or the patient's social security number.

49.     These leads are for diabetics across the nation. Primrose is a licensed pharmacy in Alaska, Alabama, Colorado, Connecticut, Delaware, Georgia, Florida, Indiana, Idaho, Iowa, Kansas, Massachusetts, Minnesota, Missouri, New Jersey, New Mexico, New York, Nevada, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Washington, West Virginia, Wisconsin, and Wyoming. With the exception of Georgia, however, the only leads that Primrose fills for patients in these states are those covered by Medicare Advantage plan; in Georgia it fills prescriptions for patients on Medicare Advantage plans as well as those enrolled in Georgia's Medicaid plan. Leads can come for patients in all of these states. For example, in October 2013 alone, Relator is aware of leads for patients in New York, Indiana, Pennsylvania, South Dakota, Wisconsin, Rhode Island, Ohio, and North Carolina, among other states.

50.     The insurers are similarly located across the country.  Defendants

have, for example, obtained and/or sold leads of patients insured by the following

Medicare Advantage insurers: Advance Rx Management PDP, Aetna PDP, Care

Improvement Plus South Central, Careplus D Humana PDP, EPIC – New York

Senior, Express Scripts PDP, Pacificare PDP, Keystone Health Plan East Inc.,

United Healthcare, Blue Cross Blue Shield of Alabama Advantage, and MVP

Health Plan Inc., among others.  Because Primrose is not an approved supplier

under Medicare's National Mail-Order Program for DTS, it cannot submit claims

made under Part B of Medicaid; it can only submit claims to Medicare Advantage

plans.

51.     As a result, Defendants Karl Blass, Karl Bucholz, and Scott Navani

knowingly sought out leads for patients that are insured through Medicare

Advantage plans. These leads make up the majority of the leads pursued by DPS

and Primrose.  Because Primrose is not able to bill under Medicare Part B,

Defendant Karl Blass informed Relator that he intends to re-sell the leads Primrose

obtains for patients that are covered by Medicare Part B.

52.     Relator discovered, while working for Primrose, that it receives

between 100 and 500 leads a day from DPS that are downloaded onto the Zoho

software ("Zoho").  Of these, approximately 95% of the leads provide enough

23

information for Primrose to bill the patient's insurer and ship supplies to the

patient. A majority of these leads turn into sales. Prior to October 2013,

approximately 78% of the leads received daily resulted in the insurer being

charged and the supplies being shipped to the patient. After October 2013 and

until at least December 2013 when Relator left Primrose, approximately 40% of

the leads received daily resulted in the insurer being charged and the supplies being

shipped to the patient.

53.     The information loaded into Defendant's Zoho software also often

contains a field that identifies the source of the lead. For example, in October

2013, Relator observed leads in Zoho attributed to Defendant Karl Bucholz for

patients in New Jersey, New York, Indiana, and Ohio to Primrose. The insurers

listed in these leads included private and government plans administered by

Horizon Advantage, Humana, United Healthcare, and Blue Cross Blue Shield.

54.     In that same month, Relator observed leads in Zoho attributed to

Defendant Scott Navani for patients in Ohio, South Dakota, Pennsylvania, New

York, Rhode Island, Wisconsin, and Minnesota, among others. Insurers covering

the patient leads submitted by Defendant Scott Navani include Careplus Humana

PDP, AARP, UP/MC Health Plan Inc., MVP Health Plan Inc., United Healthcare

of New England, Inc., United Healthcare of Wisconsin, Inc., and Bravo Health Pennsylvania Inc., among others.

55.     Relator also learned that some of the leads may have been sold to multiple pharmacies. Defendant Karl Blass complained directly to Relator that he believes Defendant Scott Navani is "double dealing" by selling the same leads to multiple pharmacies.

### C. False Statements by Diabetic Pharmacy Solutions

56.     After Defendants purchase the leads, DPS creates a profile in the "Zoho software" using the information contained in the lead, as well as listing the name of the person who provided the lead.

57.     DPS then sends an unsolicited two-page fax to the doctor listed on the lead. The first page, a cover sheet, contains Primrose's logo, address, phone number, and fax number at the top; the doctor's name and contact numbers in the middle; and, at the bottom, directions for the doctor. The directions state: "We [have] received a referral from your patient, [first name] [last name]. Please have the doctor sign the attached paperwork and fax it to (888) 711-3274 along with any progress note. If you have any questions please feel free to call us anytime about this patient or any other patient we might be able to service."

58.     The second page of the unsolicited fax is a pre-printed prescription form with blanks for the date, the doctor's name, phone number, fax number, and NPI number, the patient's name, address, and date of birth, and six "steps" for the doctor to fill out/circle/strike out.  Between the doctor's name and the patient's name, the second page states: "The following patient has requested and authorized PRIMROSE to be their diabetic supplier.  Please complete steps 1 through 6 on this form and fax WITHIN 24 HOURS or you may contact the pharmacist directly at (561) 929-2348."

59.     The six steps to be completed by the doctor are:

(i)      "ICD-9 Diagnosis Code", with options of "250.00", "250.01", "250.02," and "other";

(ii)     "Insulin Treated?" Yes or No; "If Yes, Insulin Type," "Quantity," "Syringes," and "Needles";

(iii)    "Patients [*sic*] Testing Frequency?" "1XDay," "2XDay," "3XDay," "4XDay," and "Other";

(iv)    "Length of Need: This order is good for one year from the signed Date shown below unless otherwise indicated here by the Physician. ___ 11 Refills unless otherwise indicated";

26

     (v)    "Supplies Ordered: (Please strike out item not prescribed)."

            control solution, blood glucose meter, replacement battery, test

            strips, lancet device, lancets; and

     (vi)   A blank for the physician's signature and date.

60.     DPS fills in the patient's name, birthdate, and address, and the doctor's name, phone number, fax number, and NPI number from the lead information.

61.     Only one of these questions requires the Doctor to input information not already included on the form – the type, quantity, syringes, and needles for insulin. Two of these questions require the doctor to take action to cancel the already set prescriptions – for number of refills and supplies ordered.

62.     In the majority of cases, at no point of time is the patient contacted by either DPS or Primrose before DPS sends this two-page fax to the doctor's office. Nor has the patient contacted either DPS or Primrose before DPS sends the fax.

63.     Doctors' offices commonly get similar prescription refill requests from pharmacies. Administrative personnel typically retrieve these faxes, check and verify that the listed patient is a patient of the doctor, and confirm that the doctor has prescribed similar maintenance diabetic supplies for the patient in the past. Either the administrative personnel or the doctor then completes the missing

27

information on the prescription form (circle the correct amounts, fill in information about insulin, mark testing frequency) and the doctor signs his/her name. The doctor's office then faxes the prescription form back to the fax number listed on the prescription form (the second page of the initial fax). This fax number is for the call center at DPS.

## D. False Statements by Primrose Pharmacy

64.     After DPS receives the signed prescription from the doctor, it sends the lead information to Primrose via the e-mail function in Zoho.

65.     Once Primrose receives the lead information with the signed prescription, pharmacy technicians, including Relator prior to her resignation in mid-December, upload the information into Primrose's Pioneer software database ("Pioneer").

66.     If the lead information does not include the insurer's name, pharmacy technicians run the patient's name, social security number, and address through an eligibility check built into Pioneer. Once the insurer information is found through the patient eligibility check, that information is included in the patient prospect details page in both Zoho and Pioneer.

28

### 1. *False Statements and Claims to Insurers, Including Medicare Advantage and Medicare Part D Plan Sponsors*

67.     Once the lead information, signed prescription, and insurer information are uploaded, the Primrose pharmacy technician submits electronically a claim to the patient's insurer for the DTS, including lancets, test strips, a blood glucose monitor, control solution, and a lancet device.

68.     The insurance response is instantaneous through the Pioneer system. The insurer can respond in two ways: (1) the insurer agrees to cover some amount of the cost billed by Primrose or (2) the insurer rejects the prescription and refuses to cover any amount of the bill. An insurer can reject the prescription for a number of reasons, including that the request is too soon for a refill, that the patient does not have coverage for the requested supplies, or that the products are not on the insurer's formulary.

69.     If the insurer rejects the prescription due to lack of coverage, Primrose pharmacy technicians remove the patient from their database and list the patient on a spreadsheet of "no go's."

70.     If the insurer rejects the prescription because the refill was requested too soon after the previous refill, Primrose notes as much in Pioneer and on the patient's prospect sheet in Zoho. Primrose pharmacy technicians then place the patient on a list to be submitted later when the prescription is open to be refilled.

29

71.     If the insurer accepts the prescription, Primrose pharmacy technicians review the insurer's response to determine whether providing the prescription to the patient would be profitable.  This analysis is done by comparing the insurance approved remittance amount to the cost of the co-pay requested by the insurer, factoring in the cost of shipping ($10) and the cost of the equipment, for all of the items to be sent to the patient.  If the co-pay is higher than, equal to, or only $10 less than the remittance amount for the combined items to be shipped, then Primrose cancels the fulfillment of the prescription and reverses the claim to the insurer.  This analysis is done because Primrose does not charge the patient the insurer mandated co-pay.

72.     At no point of time does Primrose inform the insurer, including Government payors, about its waiver of copayment.  Primrose, upon submitting the claim electronically, also does not inform the insurer that it has not received a request from the patient for the medication.

### 2. False Statements to the Patients

73.     If the prescription is profitable, which Relator estimates about 80% are, a Primrose pharmacy technician calls the patient on the phone number included in the lead.  Relator made such calls during her employment at Primrose.

74.    If the patient does not answer the phone, the pharmacy technician leaves a voicemail, at Karl Blass's instruction, stating, "[t]his is Primrose Pharmacy calling in regards to your DTS. Please give us a call. Our phone number is 1-866-421-1085." The Primrose pharmacy technician then notes in the Zoho patient's prospect sheet the date of the call, that it was the first call, and the time of the call. The Primrose pharmacy technician then attempts to call the patient two more times, leaving a voicemail each time and noting in the Zoho patient's prospect sheet the date and time of the call and the number of calls to the patient.

75.    Prior to October 2013, after the third voicemail left for the patient, Primrose pharmacy technicians indicate in the Pioneer system that the DTS is ready to be shipped and walk the prescriptions over to the pharmacist to approve the directions and frequency of testing. After the pharmacist approves the prescription, he or she walks it to the shipping department, which packages up the supplies and ships them to the patient.

76.    Primrose, therefore, has submitted claims for payment to insurers, including to Government payors, and shipped non-requested DTS without ever speaking to a patient.

31

77.    In October 2013, Relator informed Karl Blass that shipping the supplies without speaking with the patient, in her opinion, could violate HIPAA.[4] In response, after October 2013 Primrose changed its process. Instead of shipping the supplies after the third voicemail was left for the patient, Primrose pharmacy technicians would reverse the claim submitted to the insurance company, make notes in Zoho about the reversal, and list the patient on the "no go's" spreadsheet.

78.    The "no go's" list was initially created by Scott Navani. The "no-go's" list contains the name of the Primrose pharmacy technician that called the patient and dates of the calls. There is also a space for the patient's name, date of birth, and the reason the patient was placed on the "no-go's" list. Possible "issue codes" are available as reasons the patient was placed on the "no-go's" list. The "issue codes" available are "Lost on 2[nd] fill," "Not Authorized by patient, "PT never spoken to," and "Other please explain." There are also separate listings for prescriptions that were "CANCELED WHEN CALLED" or "PATIENT OR DOCTOR CANCELED BY PHONE." At the end of each day, the "no-go's" form instructs that it is to be submitted to "Glenn." Relator understands that the no-go list is also sent to DPS on a regular basis.

---

[4] On November 15, 2013, Relator also informed Defendant Blass that she believed that Primrose was violating the Anti-Kickback Statute. Primrose did not change its policy about waiving the co-pay in response.

32

79.    If a patient (or the patient's spouse, adult child or other caretaker) does answer the phone, the technician uses a script to guide the interaction. After asking for the patient and verifying that the patient is speaking on the phone (by asking for the patient's date of birth), the pharmacy technician says: "I'm calling to let you know we received a prescription from [Name of Patient's Doctor] to fill your diabetic supplies. They are ready to be shipped at no charge to you. I just need to verify that we have your correct shipping address."

80.    The patient, therefore, is misled into believing that the doctor chose Primrose to fill the prescription for their diabetic supplies.

81.    Most patients, at this point, confirm their address. After hanging up with the patient, the Primrose pharmacy technician notes the prescription as "Fill in Progress" in the Pioneer software and walks the prescription over to the pharmacist for review of the directions for use. After the pharmacist approves the prescription, he or she walks it to the shipping department, which packages up the supplies and ships them to the patient.

82.    Primrose, therefore, has submitted claims for payment to insurers for DTS based on false statements to patients and doctors and shipped the supplies to the patients.

33

83.     Some patients, after hearing the script used by Primrose pharmacy technicians, indicate that they do not want the supplies. If this occurs, the Primrose pharmacy technician tries to sell the advantages of using Primrose. The pharmacy technicians are taught to emphasize that there is no co-pay for the supplies and that the supplies will be shipped free to the patient.

84.     If the patient still refuses to accept the supplies, the Primrose pharmacy technician then reverses the claim submitted to the insurer, marks in Zoho in a dropdown menu " Canceled Patient Request," and lists the patient on the "no go's" spreadsheet for the day in the "CANCELED WHEN CALLED" or "PATIENT OR DOCTOR CANCELED BY PHONE" section. Relator believes that DPS sometimes contacts the patients that refuse the DTS supplies from Primrose again, to get the sale.

85.     After the patient receives the DTS, some patients contact Primrose to question the receipt of the supplies. Some patients send the supplies directly back to Primrose. In these situations, Primrose only reverses the claims submitted to the patient's insurer if the DTS has neither been tampered with nor opened. If the supplies were tampered with or opened, Primrose does not reverse the claim. Most returned supplies result in a payment to Primrose, regardless of the return of the supplies.

86.     Primrose, therefore, submitted and continues to submit false claims

for payment based upon false statements to the doctors, false statements to the

insurers, and false statements to the patients.

## VI.   DEFENDANTS' SCHEME IN ACTION

87.     Defendants' scheme is illustrated by the case of Patient A, an insulin-

dependent diabetic who has a Medicare Advantage Plan through Blue Cross/Blue

Shield of Alabama ("BCBSALA").[5]  On October 31, 2013, DPS faxed Patient A's

doctor, Dr. Zaremba, a prescription form for diabetic testing supplies. At no point

prior to October 31 did any of the Defendants contact Patient A.  Notwithstanding

the lack of patient contact, the prescription form stated that: "[t]he following

patient has requested and authorized Primrose Pharmacy to be their diabetic

supplier." Later that same day, Dr. Zaremba faxed the completed prescription

form back to DPS.  DPS subsequently transmitted this information and prescription

to Primrose, which input Patient A and his private information into its Pioneer

software.

---

[5] To protect patients' privacy, as well as comply with Fed. R. Civ. Pro. 5.2 and
other applicable rules and regulations, Relator has withheld the name of the
patients in this complaint and did not disclose any identifying information about
patient information, such as birthdates and social security numbers.  Relator will
provide additional information to the Court *in camera* upon request or to
Defendants subject to an appropriate protective order.

35

88.    As soon as Patient A was input into the Pioneer software database,

Primrose submitted claims to BCBSALA for Fora Normal Control Solution, a Fora

V12 Blood Glucose System, a Simple Diagnostic Lancet Device, Fora V12

Glucose Test Strip[s], and Lit Touch 30g Lancets on behalf of Patient A. After the

government payor notified Primrose of the reimbursement amount, Primrose was

in a position to determine that filling the prescription would be profitable.

89.    Primrose then called Patient A and informed him that his doctor had

authorized Primrose to fill his prescription for diabetic testing supplies. Primrose

also waived Patient A's copay. Primrose then shipped Patient A each of the five

items and, approximately one month later, received reimbursement from BCBS-

AL in the amount listed in the Pioneer software.

90.    The incident described above is not isolated.

## VII.  FALSE CLAIMS

91.    Defendants have submitted claims for payment to Medicare

Advantage insurers and the Georgia Medicaid program. Defendants submitted

such claims for payment despite Defendants' knowledge that the services billed for

– prescriptions for diabetic test strips, blood glucose monitors, lancet devices,

lancets, normal solution, alcohol wipes, and the like – were only prescribed on the

basis of false statements to doctors and only shipped on the basis of false

36

statements to patients. In reliance upon the above-described false claims and false statements, the United States, the State of Georgia, and Medicare Advantage contractors have disbursed funds to the Defendants.

## VIII. COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

92.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

93.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

94.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to Medicare and Medicaid programs and the contractors that ran these programs on behalf of the Government through Medicare Advantage plans false or fraudulent claims for the improper payment of diabetic testing supplies.

95.    The United States and its Medicare Advantage contractors, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

96.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

37

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

97.     Relator re-alleges and incorporates by reference the allegations
contained in the preceding paragraphs of this Complaint.

98.     This is a claim for treble damages and civil penalties under the False
Claims Act, 31 U.S.C. § 3729(a)(1)(B).

99.     By virtue of the conduct described above, Defendants knowingly
made, used, or caused to be made or used false statements material to false or
fraudulent claims submitted to Medicare, Medicaid, and Government contractors
that provide Medicare Advantage plans for the improper payment of diabetic
testing supplies.

100.    The United States and its Medicare Advantage contractors, unaware
of the falsity of the statements made, used, or caused to be made or used by
Defendants, paid for claims that otherwise would not have been allowed.

101.    By reason of these payments, the United States has been damaged,
and continues to be damaged, in a substantial amount.

## COUNT THREE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

102.    Relator re-alleges and incorporates by reference the allegations
contained in the preceding paragraphs of this Complaint.

38

103.   This is a claim for treble damages and civil penalties under the False

Claims Act, 31 U.S.C. § 3729(a)(1)(C).

104.   By virtue of the conduct described above, Defendants knowingly

conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), in violation of

31 U.S.C. § 3729(a)(1)(C).

105.   The United States and its Medicare Advantage contractors, unaware

of the conspiracy among Defendants to submit false claims based on false

statements made to doctors, Medicare Advantage insurers, and patients to generate

and ship diabetic testing supplies, paid for claims that otherwise would not have

been allowed.

106.   By reason of these payments, the United States has been damaged,

and continues to be damaged, in a substantial amount.

### COUNT FOUR
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)

107.   Relator re-alleges and incorporates by reference the allegations

contained in the preceding paragraphs of this Complaint.

108.   This is a claim for treble damages and civil penalties under the

Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1).

39

109.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for the improper payment of diabetic testing supplies.

110.   Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

111.   By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

**COUNT FIVE**
**Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2)**

112.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

113.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2).

114.   By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims for the improper payment of diabetic testing supplies.

115.   Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

40

116.   By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(3)

117.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

118.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(3).

119.   By virtue of the conduct described above, Defendants knowingly conspired to commit violations of Ga. Code Ann. §§ 49-4-168.1(a)(1), (2).

120.   Georgia, unaware of the conspiracy among Defendants to submit false claims based on false statements made to doctors, insurers, and patients to generate and ship diabetic testing supplies, paid for claims that otherwise would not have been allowed.

121.   By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN
### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1)

122.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

123. This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1).

124. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for the improper payment of diabetic testing supplies.

125. Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

126. By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT
## Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)

127. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

128. This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2).

129. By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims for the improper payment of diabetic testing supplies.

42

130.   Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

131.   By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

**COUNT NINE**
**Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(3)**

132.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

133.   This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(3).

134.   By virtue of the conduct described above, Defendants knowingly conspired to commit violations of Ga. Code Ann. §§ 23-3-121(a)(1), (2).

135.   Georgia, unaware of the conspiracy among Defendants to submit false claims based on false statements made to doctors, insurers, and patients to generate and ship diabetic testing supplies, paid for claims that otherwise would not have been allowed.

136.   By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

43

## IX.   PRAYER FOR RELIEF

**WHEREFORE,** Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Georgia's Taxpayer Protection False Claims Act and False Medicaid Claims Act;

b.      Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States and its Medicare Advantage contractors have sustained because of Defendants' actions, plus the appropriate amount to the State of Georgia under similar provisions of its False Claims Acts;

c.      The Relator be awarded the maximum "relator's share" and attorneys' fees and costs allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the Georgia False Claims Acts;

d.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

e.      Defendants disgorge all sums by which they have been unjustly enriched by their wrongful conduct; and

f.    The United States, the State of Georgia, and the Relator recover such

other relief as the Court deems just and proper.

## X. REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator

hereby demands a trial by jury.

DATED: September 4, 2014

*Jennifer A. Williams*

Jay W. Eisenhofer*
jeisenhofer@gelaw.com
Jennifer A. Williams
jwilliams@gelaw.com
GA Bar No. 931289
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000/Fax: (302) 622-7100

Reuben A. Guttman
rguttman@gelaw.com
GA Bar No. 315929
David T. Fischer*
dfischer@gelaw.com
Traci L. Buschner*
GRANT & EISENHOFER P.A.
1747 Pennsylvania Ave., NW Suite 875
Washington, DC 20006
Tel: (202) 386-9500/Fax: (202) 386-9505

Attorneys for Relator Rosa Siler

\* Not admitted in this
jurisdiction, but will file *Pro
Hac Vice* Motions shortly.

## CERTIFICATE OF SERVICE

On September 4, 2014, I hereby certify that a copy of Relator's Amended

Complaint was served upon the following persons via the means indicated below.

*Jennifer A. Williams*

## VIA CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

| United States | |
|---|---|
| United States Attorney General Eric H. Holder<br>United States Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, D.C.  20530 | United States Attorney General Eric H. Holder<br>c/o Ms. Joyce R. Branda<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>U.S. Department of Justice<br>Ben Franklin Station<br>950 Pennsylvania Avenue<br>P.O. BOX 261<br>Washington, D.C.  20530<br>(202) 307-0231<br>(202) 616-3085 |
| United States Attorney for the Northern District of Georgia Sally Quillian Yates<br>c/o Amy Berne, Chief of the Civil Division<br>United States' Attorney's Office<br>Richard B. Russell Federal Building<br>75 Spring Street, S.W., Suite 600<br>Atlanta, GA 30303-3309 | |
| **State of Georgia** | |
| Attorney General Sam Olens<br>Office of the Attorney General<br>40 Capitol Square, SW<br>Atlanta, GA 30334 | |